## MILLER vs. GIBBONS, Adm'r.

1. SWAMP LANDS: *Pre-emption claimant without right, can not question defendant's entry.*

Unless the plaintiff for pre-emption shows a superior right in himself to make the pre-emption, it does not concern him whether the patent to the defendant was rightfully issued or not.

2. SAME: *Pre-emption claimants. Contests between. Decisions of land agents when conclusive.*

The decisions of the state land agents in contests for rights of entry, are conclusive upon the courts, save in cases of fraud or mistake.

3. SUPREME COURT: *Finding of chancellor not conclusive in.*

In all equity cases which are heard upon written documents, and which come as fully before the supreme court as before the chancellor, the supreme court will inquire into the correctness of his finding of the facts.

4. SWAMP LANDS: *Widow's right on husband's improvements on.*

A widow in possession of improvements of her husband on swamp lands, subject to pre-emption, may perfect his inchoate title, but, subject to her dower, she will be held in equity as trustee of the fee for the benefit of his estate.

APPEAL from *Garland* Circuit Court in Chancery.

Hon. J. M. SMITH, Circuit Judge.

*Harrell*, and *Henderson & Caruth*, for appellant.

*McCallum*, contra.

EAKIN, J. This suit involves a contest between claimants to pre-empt certain swamp and overflowed lands of the state.

About the year 1845, John Blakely owned a tract of land in Montgomery county (now Garland), just south of, and adjoining, the tract in question, which was vacant land of the United States. His residence was very near the north line of his tract, and for his convenience he extended his improvements over the line, taking in three or four acres of the vacant land, upon which he built a stable, crib, etc., and used the land for cultivation. He had no intention to pre-empt, having already as much land as he cared to pay taxes upon. He died in 1854. His estate seems to have been solvent. Letters of administration were granted on

the eleventh of April of that year. On the seventh day of January, 1860, the final settlement and account current of the administrator was approved by the probate court, and he was ordered to turn over the assets in his hands to the guardian of the minor heirs of Blakely. This he did; filed his receipt, and was discharged.

Upon the death of John Blakely, dower was allotted, or assigned, to his widow, Clarinda. No order of court, or instrument of writing, is shown to indicate the extent of her dower, but it appears from the pleadings, and from depositions, that it consisted of about forty acres, including the residence and a portion of the lands, if not all that was arable.

The inference, from the vague and unsatisfactory testimony of witnesses on this point, is, that she took whatever interest her husband had in those vacant lands as a part of her dower. This was the natural result, indeed, of assigning to her the residence, from which all things necessary to its enjoyment would be implied. The stables, crib and opening were household conveniences. The administrator and heirs of Blakely never set up any claim to the improvements on the vacant land. As to them, it was abandoned.

From the death of her husband, in 1854, until her own death, in 1861, there is no evidence that she increased the improvements, or did any work to keep them up or add to their value. It seems that on several occasions she endeavored, through friends, to enter the vacant land under the pre-emption laws of the state, relying on the old extension of her husband's improvements over the line, and her possession of the lands contiguous under her dower. She was unable to do so, because the lands were unconfirmed. In 1861 she died also.

Defendant Gibbons, was appointed her administrator,

and assumed control of the lands which she had occupied
sdower.   He did nothing whatever upon the vacant land.
It was apparently abandoned, and up to the year 1865 had
been allowed to go to wreck.   The buildings rotted away,
and the clearing grew up in weeds and bushes.   At this
time one Golden went upon the vacant tract, consisting of
three forty-acre subdivisions, and commenced an improve-
ment.   Complainant Miller, during the same year, bought
from him the improvements which he had begun, took
possession, and continued enlarging them from year to
year, with the declared intention of making a pre-emption
under the swamp land acts of the state, as soon as he might
be able to do so.   He continued in possession until the
commencement of this suit.   His improvements had reached
the extent of a very pretty farm, variously estimated at
from thirty-five to seventy-five acres.   During all this time,
until his attempted purchase from the state, Gibbons stood
aloof, and made no attempt to stop him; or to warn him
against interference.   Whilst Miller was in possession of,
and cultivating his improvement, he rented the Blakely
farm, also, from Gibbons, for the year 1867, and perhaps
continued to hold it longer, as lessee.   The evidence on
this point is not clear.                                    •

The lands were duly confirmed to the state in 1872.

Within sixty days afterwards, on the twenty-eighth day
of July, 1872, Miller filed in the office of commissioner of
state lands, his declaratory statement, under oath, to the
effect that he had, on or about the first day of March, 1866,
commenced an improvement on the lands in question, de-
scribing them as the northwest of southeast quarter, and
the north half of southwest quarter, and the southeast
quarter of southeast quarter of section thirty-four, in town-
one south, of range twelve west—that he had filed his

application to pre-empt the same, in said office, on the thirteenth day of August, 1869—that the improvements on said land consisted of a barn and corn-crib, and between fifty and seventy-five acres under fence and in cultivation, and that he made this application for the purpose of availing himself of the benefit of the pre-emption laws of the state, and to procure a deed to the land; and that he had not theretofore availed himself of the benefit of said pre-emption laws.    This application was supported by the affidavits of P. Thornton and John D. Thornton, "citizens of said county, to me well known to be men of credibility," as recited in the affidavit, who swore that they knew the facts, as set forth in the foregoing affidavit of Miller, of their own personal knowledge to be true.    The certificates of these affidavits were signed only by the words "Deputy Commissioner of State Lands," with a blank above for the name; but it is well proved that the oaths were actually taken before the deputy commissioner, and that, by mistake and inadvertence, he neglected to write his name in the blank left for that purpose.    The lands were paid for by bonds $120, and fees $5.50.    Having filed these papers, Miller left town, expecting to return in October, and find his patent ready.

On the second day of August, 1872, defendant Robert W. Gibbons, describing himself as "administrator of C. Blakely's estate," made an affidavit before the clerk of the circuit court of Montgomery county, to the effect: that about the first day of January, 1850, he commenced an improvement on the north half of southwest quarter and northwest quarter of southeast quarter of section thirty-four, in township one south, range twenty-one west, and that, on the eleventh day of January, 1870, he had filed in the commissioner's office his application for pre emption;

that the improvements on said land consisted of about thirty acres under fence and in cultivation, and a good corn-crib and stables—worth $300; that he made the affidavit for the purpose of availing himself of the benefit of the pre emption laws of the state, and to procure a deed; and that he had not availed himself, theretofore, of the benefit of the pre-emption laws. This affidavit was supported by what purports to be the affidavits of H. S. Lamb and Shelton Fulton, credible citizens, to the effect that they knew the facts set forth in the foregoing affidavit to be true of their own personal knowledge. With regard to this affidavit, Shelton Fulton swears positively, in his deposition, that he never made it, before the clerk of the Montgomery circuit court, or any one else; that he was not in Montgomery county, or a citizen of it, in 1850, and did not, at that time, know R. W. Gibbons, the defendant, nor the land in controversy.

These papers were presented to the commissioner of state lands, who arrested the issuance of the patent to complainant, and declared a contest for pre-emption, which was set for hearing on the eighteenth day of November, following. Of this Miller had verbal but no formal notice. He did not attend on the eighteenth, being, as he says, sick; and on that day, it seems from some imperfect notes of proceedings, the commissioner decided in favor of Gibbons, who obtained the patent.

Miller then filed this bill, seeking to have the title vested in himself, and that Gibbons be declared a trustee, and for other relief which it is not necessary to notice. The matters in behalf of Gibbons were set up in response, and the case made by the pleadings and evidence was, *substantially*, as above recited.

Upon the hearing, the chancellor was of the opinion

that the proof in the case was not sufficient to warrant him in reversing the decision of the commissioner, and holding Gibbons as trustee of the land for Miller. And it appearing from the proceedings in the case, that, pending the suit, Miller had begun an action of forcible entry and detainer against some tenants of Gibbons', who had obtained possession,. and that Gibbons had filed a cross bill to enjoin the action and recover possession, the chancellor decreed that the complaint of Miller should be dismissed for want of equity; that the title of Gibbons be quieted; that he recover possession from complainant, and by a certain day have a writ for the purpose, if necessary; that the prosecution of the action at law be enjoined, and that Gibbons recover not only all his costs in this suit, but in the suit at law also. Miller appealed.

The first inquiry which arises, is: Does the complainant show any superior right in himself to make this pre-emption? For otherwise it can not concern him whether the patent was rightly issued to defendant or not.

The swamp-land act of January 12, 1853, after granting a right of pre emption to any settler on the confirmed lands,.provided in section 11, that, to obtain it, the settlers should, within thirty days after the settlement, "file their declaration in writing, setting forth the fact that they claim said tract of land," to be described in the declaration "as a pre-emption right," with the land agent of the district. And by section 37, it was provided, that "after the pre-emptor has filed his declaration, he shall make proof before the swamp-land agent of the proper district, or before some justice of the peace, by two disinterested witnesses, that he or she is an actual and *bona fide* settler," etc.

Afterwards, by act of January 16, 1855, this right of

pre-emption was given to any free white citizen of the state " who *has an improvement* on any of the swamp and overflowed lands, who shall within sixty days after such lands are advertised by the land agent of the proper district * * * file his or her declaration in writing, setting forth the fact that he or she claims said tract of land, to be described in such declaration, as a pre-emption right under the provisions of this act, with the land agent of the district." No separate provision was made for proof of the facts, but under the land system of the state, with regard to the swamp-land grant, the same proof was required as in the cases of claims for pre-emption.

In the year 1868, all the duties and powers of the land agents were transferred to the state land commissioner.

The improvement of complainant was not only a *bona fide* one, sufficient to maintain a claim for pre-emption, but it was a very valuable one. It was made with a view to pre-emption, and was of such a nature and extent as to preclude the idea that it was meant to be merely colorable. It was such as accorded with the policy of the pre-emption laws, which was directed to encourage industrious men to open and cultivate these vacant lands as soon as possible, that the resources of the state might be early developed. There is nothing to indicate that he made the improvements for defendant, or any one else save himself. He was on the land before he became the tenant of the adjoining Blakely farm under Gibbons, and the renting of that farm did not make him a tenant nor lay him under any obligations of trust with regard to the vacant swamp land which he had before occupied and was improving. If, indeed, Gibbons had considered him an intruder upon any rights of his, as administrator or otherwise, when he

began his improvements in 1865, he ought to have given him warning—and, especially when he rented the Blakely farm for 1867, there should have been some understanding that the labor and improvements done on the vacant land should inure to Gibbons' benefit. It is very evident that there was no such understanding. We can not think Miller would have taken the lease on any such terms. The improvements made by him were his own, and as he filed his declaration and proof in apt time, he was entitled to a pre-emption, unless the defendant had a better right.

The chancellor seems to have taken the proper view of the *principles* which should govern the court in dealing with the patent to Gibbons.

It has been held in numerous cases, under the laws of the United States, that the decisions of the register and receiver, with regard to contested claims for rights of entry, are conclusive upon the courts, save in cases of fraud or mistake; and the same doctrine has been adopted and applied under our state system, to the decisions of the state land agents in like contests. In the case of *Patty v. Harrell, 24 Ark., 40,* Justice Fairchild said: "This court has often held in this class of cases, generally upon the official acts of swamp-land agents and officers, that it can exercise no jurisdiction in their review. But if a person makes use of an official act to perpetrate a fraud upon another person, he shall be deprived of any benefit that has accrued thereby to himself, to another's prejudice." The patent obtained by the defendant, upon the decision of the state commissioner, must be respected by the courts, unless the circumstances of the case show that it was obtained by fraud, imposition or mistake. The question is one of fact. Did the

chancellor err in his estimate of the force of the proof? This we may inquire into in all equity cases which are heard upon written documents, and which come as fully before this court as they were before the chancellor. Such cases stand upon grounds different from verdicts, or the findings of a court sitting as a jury.

In considering the facts, and their bearing upon the question of fraud, or imposition, it will be useful to trace the rights resulting from the old improvements made by John Blakely. As for himself, he never claimed any. With the freedom of the pioneer in a new country, where land and timber are abundant, he simply used the land of the government in the vicinity of his home, and thought no harm of it. When the land passed to the state by the swamp-land grant of 1850, it became subject to state legislation. In 1853 the state gave a right of pre-emption to any one whose improvements may extend from his own lands to a portion of the swamp and overflowed lands. This right was his when he died, or rather an inchoate right, to be exercised or abandoned, as he might choose, when the adjoining land should be confirmed.

When dower was assigned to his widow, this right, by understanding of all parties interested, was passed to her, to be exercised by virtue of her possession of the dower lands. If she had exercised the right, and acquired title, it would have vested in her as dowager in the same manner, and to the same extent, as she held the houses and lands to which it was, in a manner, appurtenant. There is nothing to indicate an intention on the part of the administrator of John Blakely to assign to her a separate, absolute, interest in the old improvements, distinct from her dower in the realty. That he had no right to do, and if he had designed any such thing it would have been to the prejudice of the

heirs, and void. She had possession of the lands as dower, and might, on such possession, have turned the inchoate into a perfect legal title, if the lands had been confirmed in her lifetime. But in doing so, she would have been held as a trustee for John Blakely's estate, subject to her life-interest in the lands as a part of her dower. A court of equity would not have allowed her to make use of her possession as doweress to acquire a fee simple in her own right. But the right was not perfected by her, nor could it be. When she died, she left nothing, either in the improvements, or the lands, which could pass to her administrator. He had no vestige of right to the control of the dower lands. The widow's interest in them was gone with her death. She never made the improvements, nor did Gibbons, after her. They were confessedly abandoned, actually, from the time of her death until Golden entered upon them for improvement, in 1865, a period of four years. The heirs set up no claim. Neither did the administrator of Blakely. Golden intruded upon no one, and plaintiff took his position. The defendant, Gibbons, had absolutely no interest whatever in the vacant lands. Nothing came to him as administrator, for Clarinda Blakely's rights did not reach beyond her death. As for himself, individually, he neither made nor claims to have made any improvements whatever. Manifestly, the right of Miller to pre-empt, if not the only one in existence, was certainly superior to that of defendant.

Reverting to the declarations made in Gibbons' application, it will be seen at once by the light of the pleadings and evidence, that they were untrue, in fact, and calculated to mislead and impose upon the commissioner. In what sense could it be true that he, as administrator of Clarinda Blakely, commenced an improvement on the lands in ques-

tion in 1850? Her husband was then living, and she herself survived him from 1854 to 1861. How could he say ingenuously, in support of his own claim, that the improvements on said land consisted of about thirty acres under fence and in cultivation, when neither he nor his intestate had ever made improvements to the value of a dollar, and all that had ever been made, save the old abandoned improvement of John Blakely, were made by Miller, whose claim he was seeking to annul? He might have intended in his mind, and perhaps did, that as he claimed under the widow, and she under her husband, that their acts were his acts by a kind of relation; but even in this view, the statement involved a falsity, and was designed to, and doubtless did, mislead the commissioner. There does not seem to have been any other proof of his claim than his own oath, and the supporting affidavit of two witnesses; and over this affidavit the gravest suspicions are cast, by the direct and positive disavowal of Shelton Fulton.

There are in the evidence other indications of the disingenuous nature of defendant's claim, which, taken all together, have led this court to a conclusion, on the facts, different from that taken by the chancellor below. We think the decision of the commissioner, and the patent upon it, were obtained by misrepresentation and imposition, and that the defendant should be held a trustee of the legal title for the complainant, in the lands claimed, to-wit: The north half of the southwest quarter, and the northwest quarter of the southeast quarter of section thirty-four, in township one south, range twenty-one west. There is no contest concerning the southeast quarter of the southeast quarter of the same section, also included in complainant's application for a pre-emption.

### DIRECTIONS FOR A DECREE.

Reverse the decree of the court below, and let a decree be entered here, divesting out of the appellee, Robert W. Gibbons, all right and title which, in his own right, or as administrator of the estate of Clarinda Blakely, deceased, he has in, and to, said lands in controversy, by virtue of his said patent from the state, and vesting the same in appellant, Phillip R. Miller, in fee simple. Let the costs of this case, in this court and the court below, be paid by the appellee, Gibbons, and let the appellant be free to prosecute his action at law against James Custer et al., begun by forcible entry and detainer in the Garland county circuit court, being the same ordered by the chancellor below, to be dismissed; to the end that the costs of said action at law may be properly adjudged in said action between the parties thereto.